GoRhinoGo, LLC v. Lewis, 2011 NCBC 38.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 10 CVS 11767 |

GORHINOGO, LLC,  )
        Plaintiff  )
  )
      v.  )
  )
PAUL ALEXANDER LEWIS, TENNTEX, a  )
Tennessee General Partnership and  )
PETER GILLIS,  )
        Defendants  )
  )    **ORDER GRANTING**
    and  )   **PRELIMINARY INJUNCTION**
  )
PAUL ALEXANDER LEWIS,  )
       Third-Party Plaintiff  )
  )
      v.  )
  )
BENJAMIN H. YANNESSA,  )
ZACHARY MEDFORD and  )
BRADLEY BOWLES,  )
       Third-Party Defendants  )

THIS CAUSE, designated a complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Chief Superior Court Judge for Complex Business Cases, is before the court for determination of Plaintiff GoRhinoGo, LLC's Motion for a Preliminary Injunction (the "Motion"), pursuant to Rule 65, North Carolina Rules of Civil Procedure ("Rule(s)"); and

THE COURT, having considered the Motion, briefs in support of and in opposition to the Motion, submissions and arguments of counsel and appropriate matters of record, makes the following FINDINGS of FACT, only for the limited purpose of determining the Motion:

[1]     GoRhinoGo, LLC ("GoRhino"), is a North Carolina manager-managed limited liability company formed on or about August 27, 2009.  The sole members and managers of GoRhino at all times prior to June 30, 2010, were Defendant Paul Alexander Lewis ("Lewis") and Third-Party Defendants Benjamin H. Yannessa ("Yannessa"), Zachary T. Medford ("Medford") and Brad Bowles.[1]

[2]     Defendant Tenntex is a Tennessee General Partnership and Defendant Peter Gillis ("Gillis") is a partner in Tenntex.  Gillis is a resident of Wake County, North Carolina, and was the Tenntex partner responsible for handling matters relating to the real property at issue in this action.[2]

[3]     GoRhino has moved for leave to file a Supplemental and Amended Complaint that adds 112 Fayetteville, Inc. ("112 Fayetteville"), Raleigh Nightlife 123, LLC ("Raleigh Nightlife") and Daniel Lovenheim ("Lovenheim") as parties to this action. 112 Fayetteville is a corporation organized and existing under the laws of North Carolina, with its principal place of business in Wake County.  It was formed on or about July 11, 2011.  Lovenheim formed and controls 112 Fayetteville.  Lovenheim is a citizen and resident of Wake County, North Carolina.  Raleigh Nightlife is a manager-managed limited liability company organized under North Carolina law, with its principal place of business in Wake County.  It was formed on or about April 1, 2010.

---

[1] Compl. ¶ 1; First Medford Aff. ¶¶ 4-5.
[2] Compl. ¶¶ 3, 8.

[4]     GoRhino's Motion for Leave to File a Supplemental and Amended Complaint is not yet ripe for decision.  Therefore, at this time 112 Fayetteville, Raleigh Nightlife and Lovenheim are only proposed additional parties to this action.[3]

[5]      GoRhino's sole business is the operation of Isaac Hunter's Oak City Tavern (the "Tavern"), a bar or private club, located in leased premises identified as Condominium R on the first floor of the building at 112 Fayetteville Street, Raleigh, North Carolina (the "Fayetteville Street Premises").[4]

[6]     Tenntex is the owner of the Fayetteville Street Premises.[5]

[7]     On or about September 15, 2009, GoRhino entered into a written agreement with Tenntex to lease the Fayetteville Street Premises (the "GoRhino Lease").[6]  GoRhino renovated the premises for use as the Tavern.[7]

[8]     The GoRhino Lease anticipated that GoRhino would occupy the Fayetteville Street Premises for five (5) years.  The lease provided for an initial term of two (2) years at a rent of $5,000 per month and a three-year renewal term at a rent of $7,500 per month.[8]  The renewal term was subject to the following provisions:

> Provided that the tenant shall not be in default at any time during the initial term of this lease, this lease shall automatically renew for an additional term of three (3) years, commencing on October 1, 2011 and ending on September 30, 2014, unless either the landlord or tenant gives the other at least thirty (30) days' written notice prior to the end of the initial term that either landlord or tenant does not wish to renew the lease.
>
> [ . . . ]

---

[3] Mot. Leave File Supp. Am. Compl. Ex. 1 ¶¶ 4-6; Compl. ¶ 23.
[4] Compl. ¶ 7.
[5] *Id.* ¶ 4.
[6] *Id.* ¶¶ 7-8, Ex. B.
[7] *Id.* ¶ 7; Lewis Countercl.Third-Party Compl.  ¶¶ 17-18.
[8] Compl. ¶ 8, Ex. B §§ 2-4.

> In the event this lease is renewed, the rent for the period of October 1, 2011 through September 30, 2014 shall the sum of Seventy-Five Hundred Dollars ($7,500.00) per month.[9]

[9] The GoRhino Lease also reflects an anticipation that GoRhino would continue to occupy the premises by giving GoRhino a right of first refusal if Tenntex should elect to sell the building.[10]

[10] In January 2010, Defendant Lewis' employment as General Manager of the Tavern was terminated by unanimous vote of the other managers/members of GoRhino, on the grounds that Lewis had used GoRhino funds to pay personal debts and failed to account to GoRhino upon request.[11] Lewis admits that he used company funds for his personal benefit, but contends that this was a "loan" from GoRhino.[12]

[11] After termination of his employment with GoRhino, Lewis continued to be a member and manager of GoRhino within the meaning of G.S. 57C-03-06, and he received and accepted a distribution of GoRhino's profits after the end of its first full quarter of operation on March 31, 2010.[13]

[12] Gillis, as a partner of Tenntex, was aware of the dispute between Lewis and the other managers of GoRhino because he had communications with Yannessa and Medford about such dispute.[14] Yannessa and Medford had told Gillis prior to June 2010 that Lewis did not have authority to act by himself on behalf of GoRhino.[15]

[13] In March of 2010, Lewis and Lovenheim invited Medford to join a scheme to drive GoRhino out of business and take over operation of the Tavern's business

---

[9] *Id.* ¶ 8, Ex. B §§ 3-4.
[10] *Id.* Ex. B § 19.
[11] *Id.* ¶¶ 13-15.
[12] Lewis Countercl.Third-Party Compl. ¶ 23.
[13] Compl. ¶ 18.
[14] *Id.* ¶¶ 3, 21-22.
[15] *Id.* ¶¶ 22, 26.

through a new entity from which the other members of GoRhino would be excluded.[16] Lewis told Medford that Gillis had agreed to terminate or non-renew GoRhino's lease of the Fayetteville Street Premises, and that Lewis would cause cancellation of GoRhino's ABC Permit.[17]

[14]　The scheme outlined to Medford by Lewis and Lovenheim was contrary to the best interest of GoRhino, and contrary to any obligations of Lewis, as a manager and member of GoRhino to act in GoRhino's best interest.[18]

[15]　Although Medford declined to participate in the scheme, Lewis, Gillis and Lovenheim acted to carry out the plan to drive GoRhino out of business and replace it with an entity owned or controlled by Lovenheim and Lewis.  Specifically, there is evidence before the court to the effect that Lewis, Gillis (as a partner of Tenntex) and Lovenheim committed the following overt acts pursuant to the plan:

(a)　On June 20, 2010, Gillis joined with Lewis in executing a document purporting to cancel the GoRhino Lease (the "Termination Agreement"), effective June 30, 2010, even though GoRhino was, and at that time always had been, current on all rent payments.[19]  Lewis purported to act as a manager of GoRhino in executing the Termination Agreement, and Gillis acted as a partner of Tenntex in executing the Termination Agreement.[20]

(b)　The Fayetteville Street Premises constituted the sole place of business of GoRhino.[21]  It was a valuable and critical asset of GoRhino, and

---

[16] *Id.* ¶ 19.
[17] *Id.*
[18] *Id.*; *see* G.S. 57C-3-22.
[19] Compl. ¶¶ 31, 32, 34, Ex. K.
[20] *Id.* ¶¶ 31, 34, Ex. K.
[21] During the summer of 2011, Yanessa and Medford opened a separate business, called Joel Lane's. Yanessa Aff. ¶ 6.  Yanessa and Medford contend that Joel Lane's and GoRhinoGo are legally separate

Lewis' execution of the Termination Agreement, purportedly as a GoRhino manager, was materially contrary to GoRhino's best interest. Lewis did not inform any of the other GoRhino managers that he was signing the Termination Agreement, and no other manager approved the Termination Agreement, although a per capita majority of the managers was required under GoRhino's Operating Agreement for such action.[22]

(c)     The termination of a paying tenant would have been contrary to the best interest of Tenntex if it did not have a new tenant lined up. This, together with the scheme disclosed to Medford by Lewis and Lovenheim, and subsequent events, created an inference that Gillis and Lewis had agreed by June 20, 2010, that a Lewis/Lovenheim-related entity would replace GoRhino in operating the business at the Fayetteville Street Premises.

(d)     Gillis joined with Lewis in executing the Termination Agreement even though (i) Gillis knew that there was an existing dispute between Lewis and the other managers/members of GoRhino, (ii) Gillis had been told that Lewis did not have authority to act by himself on behalf of GoRhino and the (iii) Termination Agreement was, on its face, contrary to the best interest of GoRhino.[23] The signature of Gillis on the purported Termination Agreement was notarized by a notary in the building where Lovenheim has his office.[24]

_____

businesses and that Yanessa and Medford simply own an interest in both businesses. Yanessa Aff. ¶ 6. The owners of Joel Lane's refer to it as a "sister establishment" to the Tavern. The Tavern has promoted Joel Lane's on Facebook and other social media. First Moore Aff. Exs. 5-11.
[22] Compl. ¶ 36, Ex. A § 8(a).
[23] *Id.* ¶¶ 21, 22, 26, 36, Ex. K.
[24] *Id.* ¶ 35.

(e)     On or about June 28, 2010, Lewis, again purporting to act as a GoRhino manager, caused cancellation of GoRhino's ABC Permit.[25]  The ABC Permit was a materially valuable and critical asset of GoRhino because the Tavern, its sole business, could not be operated without the ABC Permit.[26] Accordingly, termination of the ABC Permit was contrary to the best interest of GoRhino and contrary to any duty of Lewis to act in GoRhino's best interest.[27] No other manager of GoRhino approved the termination of the ABC Permit, even though such action required a per capita majority vote of the managers.[28]

(f)     On or about June 28, 2010, Lewis purported to act as a GoRhino manager in drawing virtually all of GoRhino's operating cash from its bank accounts.[29]  This was materially contrary to the best interest of GoRhino and violated any duty of Lewis to act in the best interest of GoRhino.  None of the other GoRhino managers approved the withdrawal of the funds.[30]

(g)     Immediately after Lewis withdrew GoRhino's working capital, the Raleigh Nightlife entity paid off a Wake County property tax lien for the benefit of Tenntex and Gillis.[31]  Neither Tenntex, Gillis nor Lewis have provided any credible explanation for this payment to counter the inference that it was a payment to Gillis and Tenntex for participating in the plan of Lewis and Lovenheim to drive GoRhino out of the Fayetteville Street premises and lease

---

[25] *Id.* ¶¶ 29, 31, Ex. I.
[26] *Id.* ¶ 29.
[27] *Id.*
[28] *Id.* ¶ 29, Ex. A § 8(a).
[29] *Id.* ¶ 27.
[30] *Id.* ¶¶ 27-28.
[31] *Id.* ¶ 33, Ex. J.

the premises to a Lewis/Lovenhiem-related entity to the exclusion of the other members of GoRhino.[32]

(h)     On or about June 28, 2010, while still a GoRhino member and manager, Lewis sent by e-mail to the other managers/members of GoRhino a copy of a letter confirming that that Lewis undertook the above described actions to end GoRhino's business at the Fayetteville Street Premises.[33]

(i)     The actions by Lewis, purporting to act as a manager of GoRhino, materially injured the business of GoRhino by forcing a temporary closing of the Tavern.  However, GoRhino, through the efforts of the other managers/members, obtained a new ABC Permit, overcame the sudden loss of the company's operating capital and re-opened the Tavern business after a substantial closure.[34]

(j)     On or about July 7, 2020, Tenntex, through Gillis, filed a summary ejectment proceeding, seeking eviction of GoRhino based solely on the purported Termination Agreement signed by Gillis and Lewis.[35]  The summary ejectment proceeding against GoRhino was filed by the law firm now representing Lewis in this civil action.[36]  The same law firm also sent a letter to GoRhino's counsel, dated July 8, 2010, stating that:  "Pete Gillis . . . has asked me to advise you that should GoRhino prevail in our eviction action and remain in the premises that he does not wish to renew the lease beyond September 30,

---

[32] Lewis Countercl.Third-Party Compl. ¶¶ 23, 33, Lewis Aff.; Gillis Aff. ¶ 33.
[33] Compl. ¶ 31.
[34] *Id.* ¶ 30.
[35] *Id.* ¶ 34, Ex. K.
[36] *Id.* Ex. K.

2011.  Please let this letter serve as notice requirement pursuant to Paragraph 3 of the Lease Agreement that the landlord does not wish to renew the lease."[37]

(k)     The letter from the law firm also claimed that GoRhino's continued occupancy "is preventing my client from entering into a new lease."[38] Defendants have never identified any tenant contemplated by Tenntex at this time other than a Lewis/Lovenheim entity pursuant to the alleged scheme that Lewis and Lovenheim disclosed to Medford in March 2010.[39]

(l)     The summary ejectment proceeding was dismissed without prejudice in the face of this civil action.  However, Gillis and Tenntex have never withdrawn the notice of non-renewal, and have repeated their intent not to renew the GoRhino Lease in at least two more written notices.[40]

(m)     As reflected by their position on the Motion, Tenntex and Gillis still seek to evict GoRhino and replace it with a Lewis/Lovenheim-related entity.[41]

(n)     On or about July 15, 2011, Tenntex entered into an agreement to lease the Fayetteville Street Premises to the newly-formed 112 Fayetteville.[42] Lovenheim was the incorporator of 112 Fayetteville and executed the lease between that entity and Tenntex for the Fayetteville Street Premises.[43]  The lease provided for this entity to take over the Fayetteville Street Premises on October 1, 2011, at a rent of $7,500 per month.  This is the same rent that

---

[37] *Id.*
[38] *Id.*
[39] Gillis Aff. ¶ 26, Ex. E.
[40] Second Gillis Aff. ¶¶ 8-9; Second Moore Aff. ¶¶ 2-3; Yannessa Aff. ¶ 15; Medford Aff. ¶ 13.
[41] Gillis Aff. ¶ 26, Ex. E; Br. Opp'n Mot. Prelim. Inj.
[42] Gillis Aff. ¶ 26, Ex. E.
[43] *Id.*

GoRhino would start paying on that date under the terms of the GoRhino Lease.[44]

(o)     In August, 2011, Lewis told the owner of another business that he was taking over the Tavern and would begin operating the business on or about October 1, 2011.[45]   The law firm representing Lewis in this lawsuit also is acting as counsel for 112 Fayetteville.  Although Lewis claims that he has no "ownership" in 112 Fayetteville,[46] he has not denied that he, his fiancé or members of his family have a financial or other interest in that entity's plan to take over the Tavern's business.[47]

[16]    All of the foregoing acts of Gillis, Tenntex, Lewis and Lovenheim are consistent with the alleged scheme that Lewis and Lovenheim laid out to Medford in March 2010, at a time when Lewis undisputedly was a member and manager of GoRhino.

[17]    When the other members and managers of GoRhino learned of Lewis' actions pursuant to the scheme, they immediately acted to expel Lewis as a member of GoRhino under procedures provided in the GoRhino Operating Agreement (the "Operating Agreement").[48]   The Operating Agreement provides for Lewis to be compensated for his interest in GoRhino as of June 30, 2010, according to a formula specified in the Operating Agreement.[49]

---

[44] *Id.* Ex. E; Compl. Ex. B.
[45] Saad Aff. ¶ 3.
[46] Lewis Aff.
[47] *Id.*; Ray-Welborn Aff. Exs. A, B.
[48] Compl. ¶¶ 9, 43.
[49] *Id.* Ex. A § 12(a).

[18]    Lewis contends in this civil action that his expulsion was not valid and that he continues to be a manager of GoRhino.[50]  Plaintiff contends that if Lewis were still a manager of GoRhino, then he would have a continuing fiduciary duty to GoRhino; and that if Lewis is not still a member and manager of GoRhino, it is because he was expelled for his conduct pursuant to the scheme with Lovenheim, Gillis and others.[51]

[19]    The conduct of Lewis, Gillis and Lovenheim is directly contrary to the interest of GoRhino, even though (a) Lewis purported to act as a manager of GoRhino in carrying out acts on behalf of the scheme and (b) Lewis claims in this action that he still is a manager of GoRhino.[52]

[20]    The participation of Tenntex is and has been critical to the plan of Lewis and Lovenheim to drive out GoRhino and take over the Tavern's business for themselves, to the detriment of GoRhino and its other members.

[21]    Tenntex and Gillis have not presented credible evidence of a legitimate business reason to evict GoRhino, an established, paying tenant, from the Fayetteville Street Premises.  The arguments raised in this regard by Tenntex, involve, among other things, a contention by Tenntex that non-renewal was justified because GoRhino allegedly has not made certain capital improvements to the Fayetteville Street Premises, even though (a) the GoRhinio Lease does not require GoRhino to make such improvements and (b) it is reasonable that GoRhino would not make additional non-mandated capital expenditures when the Tenntex notice of non-renewal in July 2010

---

[50] Lewis Countercl.Third-Party Compl. ¶¶ 96-98.
[51] Compl. ¶¶ 39, 43.
[52] *Id.* ¶¶ 31, Ex. K; Lewis Countercl.Third-Party Compl. ¶¶ 96-98.

created uncertainty about whether GoRhino would be allowed to stay in the premises long enough to recoup any such expenditures.[53]

[22] The reasons argued by Tenntex for its proposed non-renewal of the GoRhino Lease on the Fayetteville Street Premises appear pretextual. Further, Tenntex's conduct reflects awareness that not renewing the GoRhino Lease would help promote the plan of Lewis and Lovenheim to squeeze out GoRhino.

[23] Tenntex, through Gillis, understood the objectives of the Lewis/Lovenheim scheme to harm GoRhino's business. Tenntex, through Gillis, accepted and agreed, either explicitly or implicitly, to do its part to further those objectives.

[24] Tenntex has presented no evidence that it ever withdrew from or repudiated the alleged conspiracy to harm GoRhino's business.

[25] By way of its Motion, GoRhino has asked the court to enjoin Tenntex prelimarily from terminating the Fayetteville Street Lease during pendency of this litigation. Tenntex vigorously opposes the Motion.

[26] The Tavern is GoRhino's only current place of business, and it will be forced to close its doors if it is evicted from the Fayetteville Street Premises. If that were to happen wrongfully, GoRhino would lose substantial and material future profits that would be extremely difficult, if not impossible, to prove.

[27] If Tenntex is allowed to evict GoRhino and replace it with a Lewis/Lovenheim-related entity pursuant to the alleged scheme complained of by Plaintiff in this action, then such entity would unfairly profit from GoRhino's improvements to the Fayetteville Street Premises and GoRhino's efforts for the last two years to build up customer goodwill at that location.

---

[53] Compl. Ex. B; Yannessa Aff. ¶¶ 12-15; Medford Aff. ¶¶ 10-13.

[28]    In contrast, Tenntex will not suffer substantial injury if it is enjoined from evicting GoRhino pending resolution of this civil action.  If GoRhino is allowed to continue in the premises, its rent for October 2011 and subsequent months will be the same as the rent that 112 Fayetteville has agreed to pay under its purported lease.[54]  In addition, the lease with 112 Fayetteville expressly provides that it will remain enforceable by Tenntex against 112 Fayetteville even if Tenntex cannot deliver possession of the premises for up to six (6) months after October 1, 2011.[55]

BASED UPON the foregoing FINDINGS of FACT, the court reaches the following CONCLUSIONS of LAW:

<u>Preliminary Injunction</u>

[29]    A preliminary injunction is an extraordinary measure that "should not be lightly granted."  *Travenol Lab., Inc. v. Turner*, 30 N.C. App. 686, 692 (1976).  It is an ancillary remedy that only will be issued if a moving party is able to show (a) a likelihood of success on the merits of its case and (b) that it is likely to sustain irreparable loss unless the injunction is issued; or if, in the opinion of the court, in weighing the respective interests of the parties, issuance is necessary for the protection of the moving party's rights during the course of litigation.  *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401 (1983).  The burden is on the moving party to establish its right to a preliminary injunction.  *Id.*; *Ridge Cmty. Investors, Inc. v. Berry*, 293 N.C. 688, 701 (1977); *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466 (2003); *Pruitt v.*

---

[54] Compl. Ex. B; Gillis Aff. Ex. E.
[55] Gillis Aff. Ex. E.

*Williams*, 25 N.C. App. 376, 379 (1975); *Smith v. N.C. Motor Speedway, Inc.*, 1997 NCBC 5, ¶ 26 (N.C. Super. Ct. Nov. 12, 1997); *see also* G.S. 1-485.

Civil Conspiracy

[30]    A civil conspiracy is an agreement by two or more persons to do an unlawful act or to perform lawful acts in an unlawful way that results in damage to the claimant.  *Dalton v. Camp,* 138 N.C. App. 201, 213 (2000), *rev'd on other grounds*, 353 N.C. 647 (2001); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC,* 2003 NCBC 4, ¶ 289 (N.C. Super. Ct. May 2, 2003), *aff'd*, 174 N.C. App. 49 (2005).

[31]    Circumstantial evidence can be sufficient to prove an action for conspiracy.  *Dalton,* 138 N.C. App. at 213; *Sunbelt Rentals*, 2003 NCBC 4, ¶ 291. Behavior that may be benign or innocuous when standing alone can acquire a different meaning when placed in a larger context.  *Terry's Floor Fashions, Inc., v. Burlington Indus., Inc.,* 568 F. Supp. 205, 210 (E.D.N.C. 1983).  Accordingly, the totality of the facts and circumstances before the court may allow the court reasonably to infer that illegal conduct occurred.  *Id.*

Likelihood of Success on the Merits of Plaintiff's Claim

[32]    When Lewis was a manager of GoRhino, he owed a fiduciary duty to act in GoRhino's best interest.  G.S. 57C-3-22.  The facts now before the court support Plaintiff's contention that the respective Defendants had an agreement and formed a civil conspiracy to to force GoRhino out of business so that a Lewis/Lovenheim-related entity could take over operation of the Tavern site.

[33]    This scheme would constitute an agreement to perform unlawful acts or to perform lawful acts in an unlawful way because, among other reasons, it constituted a

plan to violate the fiduciary duties of Lewis to GoRhino; and the plan was implemented using acts that themselves violated that fiduciary duty. G.S. 57C-3-22 (requiring managers of limited liability companies to act "in the best interest of the limited liability company").

[34] Evidence before the court supports Plaintiff's contentions that Gillis, and Tenntex, through Gillis, joined the alleged conspiracy by agreeing, either expressly or impliedly, to do – and in fact doing – their part to further the objectives of the conspiracy by:

(a) Agreeing to replace GoRhino with a Lewis/Lovenheim-related entity to the exclusion of the Members of GoRhino other than Lewis.

(b) Taking action to force GoRhino out of the Fayetteville Street Premises by executing the Termination Agreement and bringing summary ejectment proceedings against GoRhino.

(c) Giving repeated notices of non-renewal and continuing their efforts to force GoRhino out of its sole place of business. *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC,* 362 N.C. 431, 444-45 (2008) (holding that defendant could join a conspiracy by express or implied agreement).

[35] Here, the evidence supports Plaintiff's contention that Tenntex, through Gillis, knew that the goal was to force GoRhino out so that the Tavern could be taken over by a Lewis/Lovenheim-related entity, and that Tenntex and Gillis knowingly provided assistance to the accomplishment of that goal. Having joined the conspiracy, Gillis and Tenntex became exposed to liability with Lewis and any other co-conspirators

for damages caused by any act in furtherance of the common scheme. *Dalton*, 138 N.C. App. at 213 (citing *Fox v. Wilson*, 85 N.C. App. 292, 301 (1987)); *Green v. Condra,* 2009 NCBC 21, ¶ 167 (N.C. Super. Ct. Aug. 14, 2009). If Plaintiff ultimately meets its burdens of proof, Gillis, Tenntex and Lovenheim can be liable for conspiring with Lewis to violate the fiduciary duties Lewis owed to GoRhino. *Cf. Harwell Enter., Inc. v. Heim,* 276 N.C. 475, 479 (1970) (holding that if two persons conspire to violate the duties of one conspirator under a covenant not to compete, both persons are jointly liable for the breach).

[36]     Defendants Gillis and Tenntex correctly point out that in order for one or both of them to be liable to Plaintiff for civil conspiracy, GoRhino must also show an 'overt act' committed by at least one conspirator in furtherance of the conspiracy. *Sunbelt Rentals*, 2003 NCBC 4, ¶ 290 (quoting *Dalton*, 138 N.C. App. at 212). They argue that neither of them committed any overt unlawful act. However, the law is clear that in the context of a conspiracy, an otherwise lawful act can become an unlawful act when it is part of the conspiratorial plan. *Id.* In other words, it may be lawful to drive a car to the bank, but it is not lawful to drive the car to the bank as part of a conspiracy to rob the bank. The same would hold true to not renewing a lease, which on its face may be a lawful act, but which may become unlawful if it is part of a conspiratorial scheme to harm the lessee. As reflected by the above Findings, the evidence of record supports Plaintiff's contention that each of the Defendants committed overt acts in furtherance of the alleged conspiracy.

[37]     A conspiracy is deemed to continue until its goal is accomplished or the conspirators unequivocally abandon the conspiracy. Here, Defendants, including

Tenntex and Gillis, still are seeking to accomplish the goal of the conspiracy. Tenntex and Gillis have not shown any unequivocal withdrawal from the conspiracy that meets this standard. To the contrary, it is the continued participation by Tenntex, through its purported notice of non-renewal of the GoRhino Lease, that makes it possible for the goal of the alleged conspiracy to be achieved. Thus, while Tenntex might have had the power to terminate the lease for a lawful purpose, it did not have the right to promote the unlawful plan and purpose supported by the evidence here.

[38] Accordingly, GoRhino has established that it is likely to prevail on the merits of its civil conspiracy claim against Tenntex and Gillis.

## Irreparable Injury

[39] If Tenntex and Gillis were to evict GoRhino from the Fayetteville Street Premises in order to replace it with the Lewis/Lovenheim-related entity, 112 Fayetteville, such action effectively would put GoRhino out of business. It further would present GoRhino with the difficult, if not impossible, task of proving GoRhino's lost goodwill and future profits causally arising from the allegedly wrongful acts. Such circumstances would constitute irreparable harm for purposes of Rule 65. *See also, Winnfield Food Sys., Inc. v. Hardees Food Sys., Inc.,* 1996 U.S. Dist. LEXIS 13957, *12, No. 4:95-cv-005402 (M.D.N.C. Aug. 8, 1996) (quoting *United States v. Any and All Assets of Shane Co.,* 816 F. Supp. 389, 400 (M.D.N.C. 1991)) ("In the ordinary case, proof that a going concern will be forced out of business during the pendency of litigation raises a presumption of irreparable harm.")

[40]   For the reasons set forth above, Plaintiff has carried its burden of proof that it is likely to prevail on the merits and that it will be irreparably injured if an injunction is not issued.

Weighing the Respective Interests

[41]   The GoRhino Lease provides for GoRhino to pay the same amount of rent per month as 112 Fayetteville would pay under its purported lease.  Further, the purported lease with 112 Fayetteville provides that it will remain enforceable by Tenntex against 112 Fayetteville even if Tenntex cannot deliver possession of the premises for up to six (6) months after October 1, 2011.  In the interim, GoRhino ostensibly would be making its lease payments.  Consequently, a preliminary injunction to maintain the status quo pending final adjudication of this matter is likely to cause Tenntex materially less damage or injury in comparison to the risk of irreparable injury faced by GoRhino should the lease on the Fayetteville Street Premises be terminated.

Security

[42]   Rule 65(c) requires that the granting of a preliminary injunction shall be conditioned up the giving of security by the applicant in a sum determined by the court to be proper for the payment of costs and damages that may be suffered by a party ultimately determined to have been wrongfully enjoined or restrained.

[43]   Plaintiff contends that a bond in the amount of $7,500 would be sufficient to protect Tenntex against costs and damages if it is found to have been wrongfully restrained.  It is true that Tenntex is partially protected from substantial loss or damage in the near term by virtue of its proposed lease with 112 Fayetteville and by lease

payments anticipated to be made by GoRhino should the court order that Plaintiff may remain in possession of the Fayetteville Street Premises. However, there is no way to anticipate (a) the course or duration of this litigation, (b) the future economic viability of GoRhino and its ability to make lease payments to Tenntex or (c) whether 112 Fayetteville Street would be available to Tenntex in the future as a paying tenant should GoRhino cease its operations.

[44]     Accordingly, the court concludes that in order to protect the interests of Tenntex, security in the amount of $45,000, to cover six (6) months rent on the Fayetteville Street Premises, is reasonable and appropriate as a condition of granting preliminary injunctive relief in this matter.

NOW THEREFORE, based upon the foregoing FINDINGS of FACT and CONCLUSIONS of LAW, it hereby is ORDERED that:

[1]     Pending final resolution of this civil action, and unless and until otherwise ordered by this court, Tenntex and Gillis hereby are RESTRAINED, ENJOINED and FORBIDDEN from relying upon any prior notices of termination or non-renewal of the GoRhino Lease, or otherwise terminating the GoRhino Lease for any reason other than any future instance of default as provided under the terms of the GoRhino Lease, and/or engaging in any action to remove, eject, evict or otherwise interfere with the rights provided to GoRhinoGo under the terms of the GoRhino Lease and applicable North Carolina law.

[2]     While GoRhinoGo remains a tenant in the Fayetteville Street Premises pursuant to this Order, it shall perform the duties and responsibilities required of a tenant under the terms of the GoRhino Lease. Those duties shall include, among other

things, payment of rent in the amount of $7,500 per month and payment of utilities, insurance and taxes pro-rated for the period during which GoRhinoGo remains a tenant in the Fayetteville Street Premises.

[3]     Pursuant to the provisions of Rule 65(c), and as a condition of this Order, on or before October 4, 2011, at 5:00 p.m., Plaintiff GoRhinoGo, LLC shall post security ("Security"), to cover six (6) months rent on the Fayetteville Street Premises, in the amount of FORTY FIVE THOUSAND DOLLARS ($45,000).  Said Security shall be in the form of a surety bond or other undertaking satisfactory to the Clerk of Superior Court of Wake County, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained by this Order.

[4]     Except as GRANTED by the terms of this Order, the Motion is DENIED.

This the 29th day of September, 2011.